USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

S2 06 CR 41 (CM)

BRANDON SHAW and MARLON CAMPBELL,

Defendants.

## DECISION AND ORDER ON THE GOVERNMENT'S *IN LIMINE* MOTIONS

McMahon, J.:

The Government asks the Court to make various *in limine* rulings in contemplation of the upcoming trial. Defendants have responded to the Government's motions. The following constitutes the Court's rulings:

### Background

Defendants Brandon Shaw and Marlon Campbell are charged in a four-count superseding Indictment, S2 06 Cr. 41 (CM) ("the Indictment"). Count One charges the defendants with participating in a conspiracy to distribute 1000 kilograms and more of marijuana, between in or about April 2001 and March 2006, in the Southern District of New York and elsewhere, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(A), and 846. Counts Two through Four all charge Shaw and Campbell with participating in the drug-related murder of Marcus Bogle on November 14, 2002, in the vicinity of 150th Street in Queens, New York. Count Two charges the defendants with causing Bogle's death while they were engaged in a drug trafficking crime, specifically the conspiracy to distribute marijuana charged in Count One. Count Three charges the defendants with using and discharging a firearm in furtherance of a drug trafficking crime, specifically the marijuana conspiracy charged in Count One, and also in furtherance of a crime of violence, specifically the murder charged in Count Two, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii), and 2. Count Four charges the defendants with using a firearm to cause the murder of Bogle, in furtherance of the drug trafficking crime charged in Count One and the crime of violence charged in Count Two, in violation of Title 18, United States Code, Sections 924(j) and 2.

According to the Government, it expects the evidence at trial to establish the following:

Norman Harrison, a/k/a "Booty Bye," was a major distributor of marijuana in the United States from at least 2001 up until his arrest in March 2006. The individual whose murder is at the

heart of this case, Marcus Bogle, was an associate of Harrison's in his marijuana business. Around the time of the murder, Harrison had a number of reasons to wish Bogle dead, including his belief that Bogle owed him over $500,000 and may have been involved in a robbery during which Harrison was beaten and humiliated. Prior to the murder, Shaw had received marijuana on at least a few occasions from Harrison, and had met Bogle through that business relationship. Around the time of Bogle's murder, Shaw, Campbell and their co-conspirators were trying to cement a more consistent business relationship with Harrison, in order to establish themselves as marijuana distributors in Buffalo, New York and Cleveland, Ohio. To that end, Campbell and Shaw, with their co-conspirators, undertook to murder Marcus Bogle, with Harrison's approval, and otherwise offered to provide protection for Harrison's business interests. Previously, Shaw, Campbell, and their co-conspirators had been involved in numerous violent crimes, especially robberies, as a way of earning their living. They sought to leave behind that world, with its inherent risks, in favor of the relatively more stable and lucrative world of large-scale marijuana distribution. Harrison assured them that, after committing the murder of Bogle, they would never have to commit robberies again.

On the evening of November 14, 2002, Shaw and several co-conspirators picked up Marcus Bogle at a residence in the Bronx, and drove with him to a location in Queens. In Queens, while Bogle was in his own car and Campbell, Shaw, and two other co-conspirators not named herein ("CC-1" and "CC-2") were in another car, Campbell, Shaw, and CC-1 shot numerous times into Bogle's car. Police responded and Bogle was transported to the hospital, where he was pronounced dead.

CC-1, who participated in the murder, is expected to testify as a Government witness at trial. CC-1 will testify that he met Shaw and Campbell in 2002, and had committed at least two armed robberies with Campbell prior to the murder of Marcus Bogle. CC-1 will also testify that, a few months before the Bogle murder, CC-1 participated in a plot with Shaw to commit another murder. CC-1 was also involved in Campbell and Shaw's plan to distribute marijuana provided by Harrison in Cleveland and Buffalo.

According to the Government, the evidence at trial will establish that, following the murder of Bogle, Shaw, Campbell, CC-1, and CC-2 obtained marijuana from Harrison. However, a little over a month after the murder, the crew started to disperse because of intense scrutiny from the police. Specifically, on or about December 21, 2002, police went to a residence in Brooklyn that the crew used as a safe house, to execute a warrant for the arrest of Campbell. Campbell jumped out a window of the residence and was pursued by the police, but escaped. Police found approximately 16 pounds of marijuana and approximately three guns, with ammunition, at the residence. CC-2, who was still at the residence when the police arrived, was arrested. CC-1 will testify that he was at the residence the night before the police came, and saw the marijuana and the guns inside. CC-1 had left early that morning for Buffalo, and returned that evening to learn from Campbell and Shaw about what had transpired. Campbell and Shaw fled to Cleveland, Ohio. CC-2 has been in custody since that arrest.

CC-1 was arrested in February 2003 for his participation in an attempted robbery that

2

occurred in or about July 2002, and has been in custody ever since. Campbell was arrested in or about May 2003 for participating in an armed robbery of a drug dealer in the Bronx, with CC-2, which occurred in or about October 2002.

On or about September 24, 2003, Campbell pled guilty to participating in that robbery – as well as to unlawful possession of a firearm on a separate occasion, on or about November 14, 1999, in the Bronx – in the United States District Court for the Southern District of New York. He was sentenced thereafter to approximately 63 months' imprisonment.

Shaw was arrested on or about May 1, 2005 in Brooklyn, New York, for arranging a shipment of over 1,000 pounds of marijuana from Arizona to New York. Shaw was tried in the United States District Court for the Eastern District of New York and convicted, after a two-week jury trial, of conspiring to possess with intent to distribute and possessing with intent to distribute more than 1,000 kilograms of marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). Shaw was sentenced on or about January 31, 2006 to approximately 188 months' imprisonment.

Harrison continued to sell marijuana in New York and other parts of the United States until his arrest on the charges in this case in March 2006.

(Government's "404(b)" Letter Motion dated October 29, 2008).

### The Government's Proposed "Background/404(b)" Evidence

The Government seeks to introduce the following evidence at trial to establish the background of the crimes charged in the Indictment and/or pursuant to Federal Rule of Evidence 404(b).

    *A.*    *Robberies Committed By CC-1 with Campbell*

According to the Government, CC-1 is expected to testify that he was introduced to Campbell in the beginning of 2002 by a mutual friend, and that Campbell in turn introduced CC-1 to Shaw and CC-2.

CC-1 will explain that, in addition to going to parties with Campbell, he also participated in two robberies with Campbell in or about the summer and fall of 2002. The first robbery occurred in the vicinity of White Plains Road in the Bronx, and involved, among others, CC-1, CC-2, and Campbell. The victim of the robbery was an African-American male who had brought money to buy drugs from Campbell and Campbell's associates; instead, Campbell and his associates robbed the victim at gunpoint and took the victim's money, which was approximately $15,000. The second robbery took place in Mt. Vernon, New York and involved Campbell, CC-1, CC-2, and several other associates. Once again, the victim was a drug dealer. Campbell and his associates waited near the victim's house for him to appear. When he did, they forced the victim into a car and took him to

3

another location where they beat him and tortured him in an effort to force the victim to tell them the location of drugs and/or drug proceeds. During the interrogation, Campbell kicked the victim and also heated up a fork, which he used to burn the victim's genitals. After holding the victim overnight (without obtaining drugs or drug money), Campbell and another associate drove the victim – who was still alive, although injured – to an unknown location and left him there.

### B. Crimes Committed by CC-1 With Shaw

CC-1 is also expected to testify regarding a plan to rob a jeweler in or about September 2002, involving Shaw and another associate who was involved in the murder of Marcus Bogle. CC-1 will explain that, although he arrived too late to participate in the robbery, he later heard from the participants that they had taken from the victim several items of jewelry.

CC-1 will also testify about having been recruited by Shaw into a plot to murder an individual named "Blakely" in or about June 2002. CC-1 will explain that Shaw told CC-1 that he (Shaw) had previously murdered Blakely's brother, who had been expected to testify in a trial against Shaw's cousin, and shot Blakely in the neck at the same time, but that Blakely had survived. CC-1 and Shaw drove around looking for Blakely, with the plan to shoot him, but did not find him. CC-1 pled guilty to participating in this plot to murder Blakely, among other crimes.

### C. Campbell's Statements to Another Cooperating Witness ("CW-3") and Attempted Robbery with CW-3

In addition to the foregoing testimony from CC-1, the Government expects to elicit testimony from another cooperating witness who was not a participant in the Bogle murder ("CW-3"), regarding statements made by Campbell and an attempted robbery that he participated in with Campbell. Specifically, CW-3 is expected to testify that he met Campbell in the Fall of 2002 and that they were friendly for a short period of time, up through the end of 2002.

CW-3 will testify that, when he first met Campbell, he heard Campbell talking about a kidnaping/robbery of a drug dealer that he (Campbell) had participated in the previous evening, after which the victim (or his associates) returned to the house where the victim had been held and fired shots through a basement window at a male who was present. CW-3 recognized the events that Campbell was talking about, because – unbeknownst to Campbell or anyone else present – the victim was CW-3's friend and, in fact, CW-3 was the person who had fired the shots into the basement. A few days later, Campbell related to CW-3 that he had been present when an individual was murdered in Jamaica, in the course of a dispute between rival gangs.

CW-3 will further testify regarding an evening that Fall when CW-3, Campbell, and others were hanging out at an apartment in Brooklyn. CW-3 told Campbell about a double murder that CW-3 had committed, during which CW-3 and others gunned down two rival drug dealers. Campbell listened intently and then responded by saying that CW-3's story was similar to how "we"

4

– which CW-3 understood to mean Campbell and others – had "licked down Bogle" in Queens. CW-3 will explain that "lick down" is an expression used in the Jamaican criminal community to mean "kill."

CW-3 will also testify that, at some point later that Fall, he asked Campbell to obtain a residence for CW-3 to use in the course of committing a kidnaping/robbery of a drug dealer. Campbell informed CW-3 that he had obtained the residence, and was present the night that CW-3 was following the intended victim with the purpose of robbing him. However, that robbery did not take place because the participants thought that the victim was aware that he was being followed.

### D. *Other Incidents of Gun and Drug Possession*

On or about September 28, 2000, Shaw was arrested in Buffalo, New York, for possession of at least 10 pounds of marijuana. The Government is seeking details regarding that arrest, but preliminary investigation suggests that Shaw was released on bail and failed to return. A warrant for Shaw's arrest in connection with that incident is outstanding. At the time of that arrest, Shaw gave the police the alias "Nigel Brown."

On or about January 1, 2003, in the vicinity of 230th Street and Barnes Avenue in the Bronx, New York, Campbell was arrested for possession of a defaced firearm, and gave the police the alias "Omar Locke." The charge was apparently dismissed. The Government may offer the testimony of the police officer who arrested Campbell and the gun that was recovered.

### E. *The Arrest of CC-2 and Campbell's Flight from Law Enforcement One Month After the Bogle Murder*

As set forth at page 3, above, on or about December 21, 2002 – a little over a month after the Bogle murder – police went to a residence in Brooklyn that Campbell and Shaw's crew used as a safe house, to execute a warrant for the arrest of Campbell. Campbell, armed with a gun, jumped out a window of the residence and was pursued by a police, but escaped. Police found approximately 16 pounds of marijuana and approximately three guns, with ammunition, at the residence. CC-2, who was still at the residence, was arrested. CC-1, who had left early that morning, before the police arrived, will testify that he was at the residence the night before, and that the marijuana and guns found at the residence belonged to the crew. At trial, the Government intends to offer into evidence the guns, ammunition, and marijuana recovered from the house, as well as testimony from at least one law enforcement officer who was present for the incident and saw Campbell flee the scene with a gun.

### F. *The Fight in Prison Between Campbell and Harrison*

The Government further expects that another cooperating witness ("CW-4") will testify that he was a distributor of marijuana and received approximately 2,000 pounds of marijuana from Harrison between the early 1990s through late 2001.

5

CW-4 will also testify that he was incarcerated at the MCC in New York, New York, where he occasionally saw Harrison and Campbell, who were also imprisoned there. On one occasion in or about February 2007, CW-4 saw Harrison talking to another inmate who was widely believed in the prison to be a cooperating witness. CW-4 then saw Campbell approach Harrison and heard Campbell say, in effect, "why are you talking to that snitch?" Harrison responded that he would talk to whomever he wished, at which point Campbell grabbed a nail clipper and attempted to slash Harrison in the face with the pointed end of it. CW-4 broke up the fight before Harrison was injured.

### The Court's Rulings on the Government's Proposed Evidence

The Government's principal argument is that the evidence set forth above is admissible in the Government's direct case, either as proof of the charged crimes and their background or pursuant to Rule 404(b) of the Federal Rules of Evidence. The Government also argues that much of the evidence is admissible because it either constitutes Giglio (impeachment) material for the Government's cooperating witnesses or demonstrate defendant Campbell's consciousness of guilt.

The Second Circuit has taken an "'inclusionary' approach to the admission of prior-act evidence," where the "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." see United States v. LaSanta, 978 F.2d 1300, 1307 (1992) (citations and internal quotations omitted) (emphasis in original), abrogated on other grounds, 526 U.S. 559 (1994). Indeed, prior act evidence is admissible to: (1) explain the development of the illegal relationship between participants in a conspiracy; (2) explain the mutual trust that existed between conspirators; or (3) complete the story of the crime charged. See Id.; United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996). As long as such evidence "arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial," the uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (citations omitted) (alterations in original).

And while the Second Circuit has made clear that it follows an "inclusionary" approach to the admission of prior-act evidence, that approach does not relieve the trial court from its duty to weigh the Government's proposed evidence under Rule 403 and uphold the fair trial protections guaranteed defendant in the Constitution. If the probative value of particular evidence is outweighed by the unfair prejudice, the Court must exclude that evidence.

*A & B. Robberies Committed By CC-1 with Campbell/Crimes Committed by CC-1 with Shaw.*

The Court agrees that it should be permitted to elicit this evidence to explain the development of the illegal relationships between CC-1 and Campbell and Shaw and the mutual trust that existed between them.

6

To that end, CC-1 will be allowed to testify that he participated in two robberies of drug dealers with Campbell, and that Campbell wanted to move from the robbery business into the marijuana business. The Government will not be allowed to go into the underlying facts of those robberies on its case in chief. If defense counsel cross examine CC-1 on the underlying facts, then the Government will be free to elicit additional information about the robbery or robberies on redirect. The court notes that opening the door to the underlying facts of one robbery does not open the door to the underlying facts of both robberies. In no event shall the Government be permitted to inquire about Campbell's purported burning of the second robbery victim's genitalia; that particular detail would be unduly prejudicial without adding anything that would be probative of the facts of this case, and it would be difficult for the jurors to put it out of their minds. The Government must instruct CC-1 not to mention this during his testimony.

With respect to Shaw, CC-1 will obviously testify on direct that he pled guilty to being involved in a plot to murder Blakely. The Government will be allowed to elicit testimony from CC-1 that Shaw recruited CC-1 in a plot to murder Blakely, because that explains their relationship. However, CC-1 will not be allowed to testify that Shaw told CC-1 that Shaw had previously murdered Blakely's brother. Nor will be be permitted to testify about what he "heard" about Shaw's involvement in a jewelry robbery.

### C. *Campbell's Statements to Another Cooperating Witness ("CW-3") and Attempted Robbery with CW-3*

CW-3 will not be permitted to testify that he heard Campbell talking about a kidnaping/robbery of a drug dealer that Campbell had participated in. Nor will CW-3 be allowed to testify that, at behest of CW-3, Campbell procured a house to be used in a kidnaping/robbery– a crime that CW-3 says never took place because the victim became aware that he was being followed.

CW-3 will, however, be allowed to testify about the conversation he had with Campbell, where CW-3 told Campbell about a double murder that CW-3 had committed and Campbell told CW-3 that Campbell and others had "licked down Bogle" in Queens. Campbell's statement clearly qualifies as a party admission.

### D. *Other Incidents of Gun and Drug Possession*

The Government states that Shaw was arrested on or about September 28, 2000 in Buffalo, New York, for possession of at least 10 pounds of marijuana. There is no evidence that Shaw was ever convicted of this crime and as far as the court knows he was not tried for it. Nonetheless, the Government seeks to introduce the fact of the arrest, on the theory that it corroborates CC-1's testimony that Shaw had taken delivery of drugs from Harrison in the past, and also that Shaw was selling marijuana in Buffalo.

However, the fact that Shaw was arrested says nothing about who his supplier was, so the evidence does not tend to corroborate testimony that Shaw had previously taken delivery of drugs

7

*from Harrison*. That is key, because it is the involvement of Harrison that links this testimony to the conspiracy at issue in this case. In the absence of any tie to Harrison, the probative value of corroborating testimony about shaw's selling drugs in Buffalo (1) is undercut by the fact that the court (and apparently the Government) do not know what the disposition of the case was (although the Government conjectures that Shaw was released on bail but did not return to court), and (2) is outweighed by the danger that a jury would conclude that Shaw has a propensity to deal in large quantities of marijuana.

The Government also seeks to admit Campbell's arrest on January 1, 2003, for possession of a defaced firearm, arguing that it is also probative of the crimes charged in the Indictment in that it (1) demonstrates Campbell's continued access to guns – a point that is relevant to the murder charges in Counts Two through Four – and (2) is independently probative of his participation in the marijuana conspiracy charged in Count One. The Government correctly points out that the Second Circuit has long recognized that guns are "tools of the trade" for major drug traffickers, and has therefore upheld introduction of evidence of gun possession in drug cases. See, e.g., United States v. Riley, 452 F.3d 160, 167 (2d Cir. 2006); United States v. Flaharty, 295 F.3d 182, 200 (2d Cir. 2002); United States v. Muniz, 60 F.3d 65, 71(2d Cir. 1995). However, based upon what the Court has heard thus far, the Government will have little problem establishing Campbell's access to guns through other evidence. So evidence of this arrest would be cumulative – and highly prejudicial, in that the charge was apparently dismissed.

The Goverment seeks to introduce evidence that, in connection with the arrests just discussed, Shaw and Campbell gave aliases to the police. The Government does not argue that this fact has independent probative value (or at least does not identify what it proves). If the defendants were to take the stand, their prior use of aliases would have probative value as to their credibility, and I would allow the Government to ask carefully tailored questions about those incidents. If the defendants exercise their constitutional right not to testify the alias evidence has no probative value at all.

### E. *The Arrest of CC-2 and Campbell's Flight from Law Enforcement One Month After the Bogle Murder*

The evidence regarding the December 21, 2002 arrest of CC-2 at the residence in Brooklyn, the recovery of the firearms, ammunition, and marijuana from that residence, and especially of Campbell's flight from the residence is highly probative of the charges in the Indictment and the Government will be allowed to elicit all of this testimony. This event occurred a little over a month after the murder of Marcus Bogle, and is an inextricable part of the story of the crimes charged.

### F. *The Fight in Prison Between Campbell and Harrison*

The probative value of CW-4's testimony about Campbell's exchange with Harrison – about Harrison speaking to a "snitch" – is so low as to be non-existent. On the other hand, the danger is high that jurors hearing this evidence will unfairly assume Campbell guilty because he is wary of

8

snitches and ready to slice someone he thought was cooperating. CW-4 will not be permitted to testify about the "snitch" conversation.

Cross-Examination of CC1 about Sexual Assault

The Government asks the Court to preclude cross-examination of CC1 regarding a rape and sexual assault CC-1 committed during an attempted robbery in Brooklyn in July, 2002. According to the Government, CC-1 has disclosed to the Government CC-1's participation in the attempted robbery of a marijuana dealer in Brooklyn in July 2002. During that attempted robbery, CC-1 raped and sexually assaulted his fifteen year-old ex girlfriend and a second female victim, and ordered the two at gunpoint to have sex with each other. CC-1 was initially charged with rape in connection with this incident, but later pleaded guilty to attempted burglary in the second degree in full satisfaction of all the charges stemming from that incident.

It is well settled that "the scope and extent of cross-examination lies within the sound discretion of the trial judge." United States v. Scarpa, 913 F.2d 993, 1018 (2d Cir. 1990). The Second Circuit has repeatedly found that it is proper for a District Court to preclude questioning of a prosecution witness regarding sex crimes as having an insufficient bearing on the witness's credibility. See United States v. Rosa, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it an abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility"); United States v. Rabinowitz, 578 F.2d 910, 912 (2d Cir. 1978) (District Court properly precluded questions regarding "prior acts of sodomy upon young children" because such acts did not bear on the witness' credibility). Indeed, defendant concedes the state of the law on this point.

Accordingly, the Court precludes the defense from inquiring into CC-1's rape and sexual assault.

Detective Rodriguez's Alleged Misconduct

The Government asks the Court to preclude inquiry by the defense into two instances of misconduct by Detective Robert Rodriguez. In a 2003 administrative trial, Detective Rodriguez was found guilty of wrongfully entering and searching an apartment for a suspect for whom there was no arrest warrant, and abusing his authority by "threatening" to call the Administration for Children's Services. In a 2005 administrative trial, the detective was found guilty of wrongfully entering and searching an apartment by "coercing" the complainant's consent, and of wrongfully detaining the complainant during their encounter.

In United States v. Cruz, 894 F.2d 41 (2d Cir. 1990), a defendant sought to impeach a Government informant at a trial before Judge Keenan with a transcript of a sentencing hearing in a different case, in the Eastern District of New York. At that prior sentencing, Judge Korman had found the informant's testimony not credible. Judge Keenan precluded defense counsel from cross-examining the informant based on Judge Korman's remarks. The Second Circuit affirmed, holding

9

that:

> The transcript [of the sentencing proceeding] reflects only a finding that [the witness] lacked credibility as to his testimony in that case, not that he was lacking in veracity generally. In the absence of any connection between the subject of [the witness' testimony in the first case] and his testimony in the case at bar, it cannot be said that Judge Korman's finding as to the former is relevant in any way to a resolution of the issues in [the present] case.

Cruz, 894 F.2d at 43.

The Government urges the Court to preclude cross-examination of Detective Rodriguez based on Cruz. It argues that the administrative findings lack probative value concerning his character for "truthfulness or untruthfulness." Rule 608(b), Fed. R. Evid.

I am not the first district court to be presented with a Government's motion to preclude inquiry into Detective Rodriguez's misconduct. Judge Stein was confronted with this precise issue in United States v. Pedro, No. S3 03 Cr. 346 (SHS) (S.D.N.Y. Dec. 5, 2003). In Pedro, Judge Stein granted the Government's motion to preclude cross-examination of Rodriguez regarding the 2003 finding by Assistant Deputy Commissioner Sarner. Judge Stein ruled that there was no finding that the trial judge found Detective Rodriguez lacking in veracity generally, and that there was not a sufficient connection between Rodriguez's testimony at the administrative trial and his testimony before Judge Stein. See Id. at 17.

However, Judge Marrero reached the opposite result in United States v. Nelson, 365 F. Supp.2d 381, 387-91 (S.D.N.Y. 2005). In denying the Government's motion to preclude, Judge Marrero stated, "The Court disagrees with the Government's view that Commissioner Sarner's finding in Rodriguez's 2003 trial lacks any probative value concerning his character for truthfulness or untruthfulness. Rather, the Court finds that Commissioner Sarner's finding has significant probative value in this regard." Id. at 390.

I think I am the first judge to be confronted with evidence that Detective Rodriguez's testimony was not believed at two administrative trials.

The Court is persuaded that the defense should be permitted to inquire into both findings of misconduct by Detective Rodriguez. Indeed, it is hard to imagine anything more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath. See United States v. Whitmore, 359 F.3d 609, 619 (D.C.Cir.2004). Tipping the scales in favor of allowing this evidence is the fact that "on the other side of the ball," the Government intends to introduce as background considerable evidence of uncharged crimes by the defendants. It is only fair that defendants be allowed to attack the credibility of one of their accusers with that accuser's prior misconduct. If this means that the Government must call additional witnesses in order to corroborate Detective Rodriguez's testimony, so be it. In view of defendants' plan to attack the detective's credibility, their testimony would not be cumulative.

10

### The Out-of-Court Identifications

The Government learned for the first time about an out-of-court identifications, made to the case agent in September 2007, by a person expected to testify as a witness at trial. According to the Government, during the September 2007 identification procedure, law enforcement agents interviewed the Witness about relevant events that occurred shortly before the murder of Marcus Bogle. During the interview, the Witness spoke about a number of people the Witness knew at the time of Bogle's murder, including "Timmy," "Rooster," and "Mark." The Witness stated that the witness saw these three individuals in the vicinity of her home on the night of the murder. After the interview, the agents showed the Witness five photographs, one at a time, and asked the Witness, in substance, whether the Witness knew each of the persons depicted in the photographs. When the Witness viewed a photograph of the defendant Brandon Shaw, the Witness identified the person as "Timmy," one of the persons she had previously discussed with the agents during the interview. When the Witness viewed a photograph of the defendant Marlon Campbell, the Witness indicated to the agents that the person looked like "Rooster," one of the persons she had previously discussed with the agents during the interview. She also identified two of the other three photographs.

Shortly after the interview ended, the Witness called the agents and confirmed that the photograph of the defendant Marlon Campbell that the Witness had just seen was, in fact, a photograph of "Rooster."

On October 29, 2008, the Government interviewed the Witness at the United States Attorney's Office. After the interview, the Witness was shown several photographs, all of which were different from the ones the Witness had viewed during the September 2007 interview. The Witness did not identify photographs of either defendant.

The Government notified the Court and the defendants as soon it became aware of the September 2007 photo showing. The Government also revealed that the Witness had failed to identify defendants during her pre-trial interview.

At defendants' request, the Court ordered a hearing to determine whether – in light of the out-of-court identifications – the witness would be allowed to make an in-court identification during the trial. The hearing was held on November 10, 2008. The two agents (Phildius and Quinn) who were present at the interview in September 2007 testified – credibly, in the opinion of the court – that (1) the Witness volunteered the names of the defendants and others during the interview and the agents did not suggest names to her; (2) the Witness identified the defendants and two others whose names she had volunteered in a series of photographs that were shown to her; (3) the agents did not suggest to the Witness who was depicted in the photographs, but instead asked the neutral question, "Do you know who this person is?" and (4) Agent Phildius both covered any identifying writing on several of the photographs before showing them to the Witness and showed her the pictures in a manner that

11

did not allow her to look through the paper and see handwriting on the other side (he slid the photographs across the top of a table).

A defendant "has a due process right not to be the object of suggestive police identification procedures that create '"a very substantial likelihood of irreparable misidentification."'" United States v. Thai, 29 F.3d 785, 807 (2d Cir. 1994) (quoting United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968))). A violation of that right can lead to the suppression of an in-court identification of the defendant. "In evaluating whether an in-court identification is constitutionally permissible, courts generally engage in a two-step inquiry." United States v. Kwong, 69 F.3d 663, 666 (2d Cir. 1995).

> First, the court inquires whether the pre-trial identification procedures were unduly suggestive. Second, if the procedures were unduly suggestive, the court must ask "whether an in-court identification will be the product of the suggestive procedures or whether instead it is independently reliable."

United States v. Tortora, 30 F.3d 334, 338 (2d Cir. 1994) (quoting Concepcion, 983 F.2d at 377); accord, e.g., Kwong, 69 F.3d at 666; United States v. Maldonado-Rivera, 922 F.2d 934, 974 (2d Cir. 1990).

In view of my findings of fact set forth above, the identification procedure was not unduly suggestive. There is, therefore, no need to hold a collateral source hearing.

This constitutes the decision and order of the Court.

November 13, 2008

Colleen McMahon
U.S.D.J.

BY ECF AND BY FAX TO ALL COUNSEL

12