UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

UNITED STATES OF AMERICA,

        against-

BRANDON SHAW,

        Defendant.
———————————————————————x

06 CR 41 (CM)

### DECISION AND ORDER ON DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

McMahon, J.:

On January 13, 2010, the Court sentenced Brandon Shaw[1] to life imprisonment for his involvement in the murder of Marcus Bogle. Shaw is currently incarcerated at United States Penitentiary McCreary.

Before the Court is Shaw's motion asking the Court to grant him compassionate release, pursuant to 18 USC § 3582(c)(1)(A), so that he can obtain appropriate medical care for his ailing knees. ECF Doc. 207, Shaw Motion at 1. In the alternative, Shaw asks that the Court order the Bureau of Prisons ("BOP") to transfer him to the Federal Medical Center at Devens, Massachusetts, "where he will hopefully be able to obtain surgery and adequate physical therapy to regain the use of his left leg." *Id.*

The Government opposes Shaw's motion for release but does not object to the Court's recommending that he be transferred to a BOP medical facility.

---

[1] While the defendant is named Brandon Shaw on the docket and is referred to by that name in the underlying proceedings, he uses the name Nigel Brown, in his compassionate release motion. His counsel says that Brandon Shaw is indeed his true name, but that the Bureau of Prisons refers to him as Nigel Brown. The Court will refer to defendant in its decision by the name he was indicted under, and the name he says is his true name: Brandon Shaw.

1

Background

Between April 2001 and March 2006, Brandon Shaw, Norman Harrison, and Marlon Campbell, were involved in a marijuana trafficking scheme. Presentence Report ("PSR") ¶ 2. Harrison was a marijuana distributor who brought truckloads of marijuana from California to the Northeast. PSR ¶ 11. Norman supplied multiple drug sellers, including Brandon Shaw and Marcus Bogle, both of whom operated in the Bronx, New York. *Id.* Campbell was one of Shaw's associates in the marijuana business. *Id.*

In December 2001, Harrison was robbed in his Bronx apartment. *Id.* ¶ 12. The armed robbers entered Harrison's apartment, bound him by his hands and feet, beat him, threatened an elderly woman and child in the apartment, and then made off with over half a million dollars of Harrison's drug money. *Id.*

Harrison believed Bogle was involved in the robbery and commissioned Shaw to kill Bogle in retaliation and in order to protect Harrison's drug business from further robberies. *Id.* ¶ 13. Shaw enlisted Campbell to assist in Bogle's murder. In exchange for the killing, Shaw and Campbell anticipated that Harrison would provide a steady supply of marijuana that would allow them to expand their drug business. *Id.* ¶¶ 13–14.

On November 14, 2002, Harrison told Shaw that he (Harrison) was with Bogle and that Shaw should kill Bogle. *Id.* ¶ 15. Shaw, Campbell, and others went to the home of Bogle's girlfriend in the Bronx that night and lured Bogle from the house. *Id.* ¶ 16. After Bogle got into his car alone and was stopped at a stop sign, Shaw, Campbell, and others pulled up in another car next to Bogle and shot him to death. *Id.*

On November 14, 2007, Shaw was indicted on four counts: (1) conspiracy to distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 812, 841(a)(1), and

841(b)(1)(A); (2) engaging in a continuing criminal enterprise that caused an intentional killing of an individual in violation of 21 U.S.C. § 848(e)(1)(A); (3) discharge of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and (4) causing death by use of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(j). Shaw was convicted on all four counts by a jury on December 5, 2008.

On January 13, 2010, the Court sentenced Shaw to life imprisonment on each of the four counts, all to be served concurrently.

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing

"extraordinary and compelling circumstances" warranting release.[2] In the past, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. § 3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling circumstances."[3] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in the district court. *United States v. Brooker* No. 19-32180-CR, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020). The Second Circuit reasoned that the language of § 1B1.13—language that has not been updated since the passing of the First Step Act—addressed only sentencing reduction motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "district courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in

---

[2] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

[3] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A)    Medical Condition of the Defendant—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii)    The defendant is—
        (I)    suffering from a serious physical or medical condition,
        (II)    suffering from a serious functional or cognitive impairment, or
        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

motions for compassionate release," and that "neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at *7.

What *Brooker* did not change, however, is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must first consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they are applicable, and determine whether they counsel for or against release. A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

### Shaw Exhausted his Administrative Remedies in the Bureau of Prisons

Bureau of Prison records show that Shaw applied for a sentence reduction on April 16, 2020 on the basis of complications from his multiple knee surgeries. That request was denied by the warden on April 30, 2020, and subsequent appeals of the denial of a sentence reduction were also denied. Accordingly, Shaw has exhausted his administrative remedies, and the present motion for compassionate release is properly before the Court.

### Shaw's Motion Before the District Court

Shaw argues that his chronic and severe knee problems – which could result in a left leg amputation – combined with the deficient medical care he has received while incarcerated, including lack of sufficient physical therapy and access to specialists, constitute extraordinary and compelling circumstances warranting his release. ECF Doc. 207 at 1–8.

Shaw asserts that since his arrest and subsequent detention in May 2005, he has had issues with both knees, necessitating multiple knee surgeries, as well as replacements of both knees. *Id.* at 1–4. Despite these measures, Shaw continued to experience extremely limited mobility and significant pain, largely in his left knee, which also required him to take numerous

medications that contributed to additional health problems. *Id.* at 2–8. Due to his knee problems, he could not walk and needed a wheelchair or walker to move. *Id.* at 5. At the end of 2021, prison doctors spoke to Shaw about potential amputation of his left leg. *Id.* at 7.

Shaw claims that throughout his time in custody, he has received inadequate medical care for his knee conditions. After a successful right knee replacement, he claims he has suffered from complications of a "botched" left knee replacement in prison. *Id.* at 6. He further claims that, on multiple occasions after receiving knee surgery or otherwise being referred to physical therapy by medical staff, he did not receive timely therapy for several months, resulting in additional deterioration of his knees. *Id.* at 3–4, 7. According to Shaw, he has also failed to receive or experienced a significant delay in receiving the proper medical equipment or accommodations that he needed to move around the prison independently, forcing him to rely on assistance from others. *Id.* at 7–8. Shaw says that there were periods when he failed to receive any medical care, including one instance in which he suffered a pulmonary embolism that required emergency hospital care after the prison failed to properly and timely remove his leg cast after a left knee surgery in March 2014. *Id.* at 2–3.

Finally, Shaw complains that United States Penitentiary McCreary (where Shaw is presently incarcerated) lacks the medical specialists he needs to maintain his left leg and that he is not receiving physical therapy there. *Id.* at 7. In his reply papers, Shaw summarizes his argument for why this court should grant him compassionate release

> The harm that has been caused to Mr. [Shaw] is permanent. He has received five knee surgeries that required specific physical therapy to ensure that the prosthetics are accepted by his body. The lack of physical therapy is not the grounds for the compassionate release. This motion for compassionate release is filed because for the past 18 years, Mr. Brown has been tortured with surgery upon surgery without receiving the aftercare he needed for his body to accept the prosthetics. He can no longer walk. His leg extends in a K shape, that makes it

6

> impossible for him to care for himself and causes constant pain. The prison has denied him access to either a wheelchair or a four-wheeled walker with a seat. Because of this he cannot hold his commissary items or his food by himself. He cannot care for himself in the institution.

ECF Doc. 215.

The saga of the treatment of Mr. Shaw's knees while incarcerated is a miserable one. However, his claim that he has been "tortured" and has received inadequate medical care during the entirety of the time he has been in BOP custody is not supported by the records of his medical care. The BOP has operated on Shaw's knees five times (including two knee replacement surgeries), provided him with physical therapy, prescribed self-directed physical therapy regimens, performed a surgical pain abatement procedure, and prescribed appropriate medications to dull the varying levels of pain he has endured over the years.

Indeed, it appears that Shaw's left knee pain is currently under control and that there is no longer a potential need to amputate. Although Shaw's medical records referenced the possibility of amputation early in 2022--seemingly as an option of last resort in the event that other more moderate treatments failed—it appears that his left knee has responded very well to the most recent treatments provided by the prison. *See* Govt. Ex. A at 28, 42, 49. Specifically, in June 2022, Shaw received a sleeve for his left knee brace and increased medication, followed by a left genicular nerve block or ablation performed in September 2022. *Id.* at 10, 19, 23. According to the records of Shaw's medical visits on October 11 and November 1 and 9 of 2022, he reported no pain. *Id.* at 1, 4, 7. The health provider separately noted on November 17, 2022, that there is no need for a further ablation at this time. Govt. Ex. B at 1. Nor has there been any discussion in

7

Shaw's medical records of amputation after the nerve block or ablation were performed. Shaw even acknowledges that the nerve block "has helped him with the pain," and he does not argue that his knee is currently in pain. Dkt. 207 at 7.

Indeed, the latest medical records reflect that Shaw is able to walk and that he has supportive devices including a left knee brace, sleeve, and walker. *See* Govt. Ex. A at 5 (noting that the defendant was "ambulatory" in November 2022), 7 (noting that the defendant was "ambulating without any difficulty" in October 2022), 71.) There is no indication that Shaw is currently unable to independently care for himself.

As for Shaw's assertions regarding a lack of physical therapy while incarcerated at McCleary, Bureau of Prisons records do not appear to contain a medical recommendation for physical therapy in 2022, nor is there a record that Shaw has asked for such services in his medical visits in 2022. In his November 9, 2022 health services visit, he did not report any complaints. *See* Govt Ex. B at 1. In the medical notes in connection with Shaw's left knee ablation and nerve block, there is no reference to any associated physical therapy in conjunction with or subsequent to the procedure. Govt. Ex. A at 10, 26, 42, 49; Govt. Ex. B. at 1.

Regarding the prison's alleged lack of specialists, Shaw fails to identify the specific specialists he seeks, and he has not established why these specialists are critical to maintenance of his left leg function. To the contrary, the fact that Shaw's most recent treatments for his left knee have dramatically improved his pain strongly indicate that the medical care he has been receiving for his left knee is currently adequate.

The bottom line is that Shaw's current medical condition, and the quality of the care he is currently receiving at McCreary, do not provide "extraordinary and

compelling" reasons warranting his release.

### The § 3553(a) Factors

Even if Shaw had met his threshold burden of demonstrating an "extraordinary and compelling" reason to be considered for compassionate release, the sentencing factors at 18 U.S.C. § 3553(a)—which the Court must consider in connection with a motion for a sentence reduction, *see* 18 U.S.C. § 3582(c)(1)(A)—counsel against a sentence reduction. Principal among those considerations in this case are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1)–(2).

The nature and circumstances of the offense could hardly be more serious: Shaw was convicted of murder, among other things, for his involvement in luring an individual out of his home to be shot to death, in hopes of securing additional marijuana to expand his drug business. As this Court said at sentencing, Shaw was "a cold-blooded killer" and that he was "part and parcel of [the] murder from the moment it was conceived. . . . No more serious crime can be committed [and that the] "nature and circumstances of the defendant, especially . . . the trickery, that was used to get [the victim] into a position where he could be killed, warrant only the most draconian of punishment . . . . Everybody who was involved in this crime deserves the max." Sentencing Transcript at 19-21. The sentence of life imprisonment continues to be appropriate given the grave nature of Shaw's crimes— no reduction is warranted.

The motion for compassionate release is denied.

The Court's Recommendation

While the Court is satisfied that the BOP has provided defendant with adequate medical care, the Court recognizes that one would not necessarily choose a BOP medical facility for knee replacement surgery; and nor would one want to convalesce after surgery in a federal penitentiary. But, of course, it was Mr. Shaw who put himself in that position. That said, the Court recommends that the BOP (1) temporarily, transfer Shaw to a medical facility, where he is to be given a full medical evaluation, (2) treated consistent with that evaluation, and (3) ultimately designated to a facility that can accommodate whatever therapy needs he may have.

This constitutes the decision and order of the Court

Dated: April 26, 2023

*Colleen McMahon*
Colleen McMahon
United States District Court Judge